**In the United States District Court
for the Western District of Louisiana
Lafayette Division**

| | |
|---|---|
| **United States of America** *ex rel.* **Tamra Goodie** <br><br> and <br><br> *ex rel.* **Nancy Morrill** <br><br> Plaintiffs, <br><br> v. <br><br> **Acadiana Management Group, Lafayette Physical Rehabilitation Hospital, and Carolyn Smith,** <br><br> Defendants. | CIVIL ACTION <br><br> NO. <br><br> JUDGE <br><br> MAGISTRATE <br><br> Complaint for Violations of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* <br><br> Filed Under Seal <br><br> Jury Trial Demand |

## COMPLAINT

*Qui tam* relators Tamra Goodie and Nancy Morrill (together, "Relators"), by and through their attorneys, on behalf of the United States of America, file this complaint against Acadiana Management Group, L.L.C. (AMG), Lafayette Physical Rehabilitation Hospital, L.L.C. (LPRH), and Carolyn Smith (Smith) to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, committed by the Defendants.

1.     Based in Lafayette, LA, AMG is a privately-owned provider of post-acute healthcare services with 19 post-acute care hospitals, including LPRH.

2.     LPRH is a free-standing, thirty-two bed specialty hospital in Lafayette, LA that provides inpatient physical rehabilitation services.

3.     LPRH's medical director, Smith, has an ownership stake in LPRH, giving her a voice in LPRH administration and operations.

4. Smith receives a bonus or commission based on the number of patients admitted to LPRH, LPRH's admission rates, or LPRH's income.

5. Since at least 2005, Defendants participated in an ongoing scheme to defraud the Federal government and violate 31 U.S.C. § 3729(a)(1)(A)-(B), 42 U.S.C. § 1395y(a), 42 C.F.R. § 412.606(c), 42 C.F.R. § 412.622(a)(3)(ii), (iv), and 42 C.F.R. § 412.622(a)(4)(i) by:

   a. Submitting false claims for payment to Medicare for medically unnecessary and unreasonable services;

   b. Admitting new patients for inpatient stays under false diagnoses;

   c. Readmitting former patients for inpatient stays under false diagnoses.

   d. Admitting patients for inpatient stays before a rehabilitation physician properly certifies admission paperwork for Medicare within 48 hours of their admission; and

   e. Failing to comply with requirements that rehabilitation physicians meet face-to-face with patients during their inpatient stays at least three days each week.

6. Therefore, Defendants violated the federal False Claims Act when they submitted false claims for payment to Medicare for medically unnecessary and unreasonable services provided to patients admitted for inpatient stays under false diagnoses.

7. Defendants violated 42 U.S.C. § 1395y(a) and 42 C.F.R. § 412.622(a)(3)(ii), (4)(i) by providing medically unnecessary and unreasonable services to patients admitted for inpatient stays under false diagnoses.

8. Defendants violated 42 C.F.R. § 412.606(c) requiring accurate patient assessments before inpatient admissions by admitting patients for inpatient stays under false diagnoses.

9. Defendants violated 42 C.F.R. § 412.622(a)(4)(i) and Medicare guidance requiring the completion of all elements of patient assessments before inpatient admissions, including signed certifications that patient assessments are accurate.

10. Defendants violated 42 C.F.R. § 412.622(a)(3)(iv) requiring rehabilitation physicians to conduct face-to-face visits with patients at least three days each week during their inpatient stays.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a).

12. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside, and transact business in this judicial district.

13. Venue is proper in this Court under 28 U.S.C. §§ 1391(c), 1395(a), and 31 U.S.C. § 3732(a) because the complained of illegal acts occurred within this judicial district, Defendants are residents in this district, and because Defendants transact business within this judicial district.

## ABOUT THE PARTIES

**Relator Tamra Goodie**

14. Relator Tamra Goodie is a citizen of the United States and is currently a resident of Lafayette Parish, Louisiana.

15. Goodie is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that her knowledge of the information contained herein has not been publicly disclosed.

16. Goodie brings this civil action for violations of 31 U.S.C. § 3729(a)(1)(A)-(B) for herself and for the United States Government pursuant to 31 U.S.C. § 3730(b)(1).

17.     Goodie was a nurse at LPRH from February 2005 until she resigned in March 2015 due to problems she observed while working at LPRH.

18.     Goodie turned down an offer by LPRH to give her a raise if she stayed.

**Relator Nancy Morrill**

19.     Relator Nancy Morrill is a citizen of the United States and is currently a resident of Lafayette Parish, Louisiana.

20.     Morrill is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and states that her knowledge of the information contained herein has not been publicly disclosed.

21.     Morrill brings this civil action for violations of 31 U.S.C. § 3729(a)(1)(A)-(B) for herself and for the United States Government pursuant to 31 U.S.C. § 3730(b)(1).

22.     Morrill was an admissions coordinator at LPRH from May 2012 until she resigned in May 2015.

23.     Morrill verified patient insurance for patient stays at LPRH.

**Defendant Acadiana Management Group, L.L.C.**

24.     AMG is a Louisiana limited liability company, domiciled and with its principal place of business in Lafayette, Louisiana.

25.     AMG is a privately-owned provider of post-acute healthcare services based in Lafayette, LA with 19 post-acute care hospitals and over 1,700 employees.

26.     AMG's long-term acute care hospitals provide continued acute level of care for patients suffering complex medical conditions such as respiratory failure, ventilator dependence, complicated infections, chronic non-healing wounds, cardiac complications, and surgical complications.

27. AMG's inpatient rehabilitation facilities—including defendant LPRH—provide care to patients who meet Centers for Medicare & Medicaid Services (CMS) diagnoses for inpatient care, including traumatic brain injury, poly-trauma, stroke, neurological disorders, and joint replacements.

**Defendant Lafayette Physical Rehabilitation Hospital, L.L.C.**

28. LPRH is a Louisiana limited liability company, domiciled and with its principal place of business in Lafayette, Louisiana.

29. LPRH is a free-standing thirty-two bed specialty hospital in Lafayette, LA owned by AMG, Smith, and other LPRH physicians.

30. LPRH provides inpatient physical rehabilitation services.

31. LPRH accepts Medicare, Medicaid, and private insurance, as well as self-paying patients.

32. LPRH admits as many as 60 or more patients for inpatient stays each month.

33. The average inpatient stay at LPRH is 10 to 14 days.

34. Approximately 90 percent of LPRH patients are insured by Medicare.

35. LPRH has a low staff-patient ratio and provides intense patient and family education.

**Defendant Carolyn Smith**

36. Smith is a resident and domiciliary of Lafayette, Louisiana.

37. Smith is LPRH's medical director.

38. Smith started working at LPRH in 2005.

39. Smith was the only rehabilitation physician at LPRH from approximately 2007 to 2013.

40. Smith has an ownership stake in LPRH.

41. Smith exerts significant control over LPRH administration and operations.

42. Smith receives a bonus or commission based on the number of patients admitted to LPRH, LPRH's admission rates, or LPRH's income.

43. Smith must certify patient medical conditions and approve patient admission for inpatient stays at LPRH.

## BACKGROUND

**About the Medicare Program and Inpatient Rehabilitation Facilities**

44. Medicare is a federal health insurance program for people age 65 or older, people under age 65 with certain disabilities, and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

45. Medicare offers eligible beneficiaries Part A hospital insurance, Part B medical insurance, and prescription drug coverage.

46. Medicare Part A helps cover inpatient care in hospitals, including inpatient rehabilitation facilities (IRFs).

47. IRFs are free-standing rehabilitation hospitals and rehabilitation units in acute care hospitals.

48. IRFs provide an intensive rehabilitation program, and patients who are admitted must be able to tolerate three hours of intense rehabilitation services per day.

49. IRFs are paid under the IRF Prospective Payment System.

50. In order to be paid under the IRF Prospective Payment System, IRFs must submit an IRF patient assessment instrument form—White House Office of Management and Budget control number 0938-0842—to CMS's national assessment collection database.

**Medicare IRF Patient Assessment Instrument Form Requirements**

51. IRF clinicians are required to perform a comprehensive, accurate, standardized, and reproducible assessment of each Medicare patient admitted for IRF inpatient stays using the IRF patient assessment instrument form.

52. IRF patient assessment instrument forms must be completed for each Medicare patient admitted for an IRF inpatient stay and signed within 48 hours by a rehabilitation physician, who makes a certification under Item Z0400A.

53. The certification under Z0400A reads:

> "I certify that the accompanying information accurately reflects patient assessment information for this patient and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that patients receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or may subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information."

**How Medicare Claims Are Submitted and Paid**

54. Medicare claims may be electronically submitted to a Medicare Administrative Contractor from a healthcare provider using a computer with software that meets electronic filing requirements as established by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) claim standard and by meeting CMS requirements.

55. Providers that bill institutional claims are also permitted to submit claims electronically via direct data entry screens.

56. Medicare can send payments directly to a provider's financial institution whether claims are filed electronically or on paper.

**Medicare Claim Requirements**

57. IRF Medicare claims must be reasonable and necessary.

58. In order for Medicare claims to be reasonable and necessary,

   a. There must be a reasonable expectation that each patient can actively participate in and benefit from an intensive rehabilitation therapy program; and

   b. A rehabilitation physician must conduct face-to-face visits with each patient admitted for inpatient stays at least three days each week during the patient's stay in the IRF to assess the patient both medically and functionally, as well as modify the patient's course of treatment as needed.

## FACTUAL ALLEGATIONS

**Patients Are Being Admitted to LPRH for Inpatient Stays Under False Diagnoses and Provided Unnecessary and Unreasonable Medicare Services that are Billed to Medicare**

59. LPRH is a state-of-the-art, CMS-certified IRF.

60. As a state-of-the-art facility, LPRH is expensive to operate and maintain.

61. Low bed counts threaten the financial health and viability of LPRH.

62. Smith worries about low bed counts at LPRH.

63. Smith wants to keep LPRH at full patient capacity.

64. Smith directs LPRH's nurses and admissions coordinator to admit patients for inpatient stays at LPRH under false diagnoses to raise bed counts.

65. Smith directs LPRH's nurses to admit patients for inpatient stays at LPRH under false diagnoses to keep LPRH at full patient capacity.

66. Smith uses LPRH's patient living room to operate her own clinic once every two weeks.

67. Smith calls some former patients to request they visit her clinic at LPRH so she can readmit them for inpatient stays at LPRH under false diagnoses.

68. Smith tells some of the former patients she calls that she will not renew their prescriptions unless they visit her clinic at LPRH.

69. When patients visit Smith's clinic at LPRH, the visit is double billed to Medicare: once as Smith rounding in the hospital and once as a clinic visit.

70. Smith approves most of the other patients admitted for inpatient stays at LPRH remotely by telephone with LPRH's nurses.

71. LPRH's nurses are generally the first to see and evaluate patients before admissions for inpatient stays.

72. LPRH's nurses document the patient's medical history and physical assessment.

73. LPRH's nurses review their patient evaluations with Smith by phone.

74. During her calls with LPRH's nurses, Smith diagnoses the patients based on the LPRH's patient evaluations without having seen the patients and either approves or does not approve patient admissions for inpatient stays at LPRH.

75. About half of LPRH's inpatient population is admitted under false diagnoses.

76. Approximately 50 percent of patients Smith directs LPRH's nurses to admit under false diagnoses for inpatient stays at LPRH are new patients.

77. Approximately 50 percent of patients Smith directs LPRH's nurses to admit under false diagnoses for inpatient stays at LPRH are former patients.

78. The new patients Smith directs LPRH's nurses to admit under false diagnoses for inpatient stays at LPRH are 20 to 30 percent of LPRH's total inpatient population.

79. The former patients Smith directs LPRH's nurses to admit under false diagnoses for inpatient stays at LPRH are 20 to 30 percent of LPRH's total inpatient population.

80. Smith instructs LPRH's admissions coordinator what the diagnosis is for each patient admitted for inpatient stays at LPRH.

81. Smith does not order tests to verify diagnoses because Smith knows the results could potentially undermine her false diagnoses.

82. As a consequence of Smith admitting patients for inpatient stays at LPRH under false diagnoses, patients received unnecessary and unreasonable medical care.

83. As a consequence of Smith admitting patients for inpatient stays at LPRH under false diagnoses, some patients may have died as a result of care Smith provided the patients.

**Examples of Patients Smith Admitted for Care of Previously Treated Medical Conditions**

84. When directing LPRH nurses to admit patients for inpatient stays at LPRH under false diagnoses, Smith sometimes admits patients for care of medical conditions for which they had already received treatment and did not need readmission for further treatment.

85. Even though a cerebrovascular accident generally only requires one inpatient stay, Smith approved the admission of M.P. for inpatient stays at LPRH approximately three times between 2013 and 2014 for a cerebrovascular accident.

86. M.P. did not need multiple inpatient stays at LPRH for physical rehabilitation.

87. M.P. died after overdosing from a pain medication Smith prescribed.

88. Smith was the only physician who prescribed medications to M.P.

89. Even though a cerebrovascular accident generally only requires one inpatient stay, Smith approved the admission of V.M. for inpatient stays at LPRH approximately five times between 2011 and 2013 for a cerebrovascular accident.

90. V.M. did not need multiple inpatient stays at LPRH for physical rehabilitation.

91. V.M. is now deceased.

92. Even though post-prosthetic training generally only requires one inpatient stay, Smith approved the admission of W.W. for inpatient stays at LPRH approximately seven times between 2014 and 2016 for post-prosthetic training.

93. W.W. did not need multiple inpatient stays at LPRH for post-prosthetic training.

**Examples of Patient Medical Conditions Smith Fabricated to Admit Patients**

94. When directing LPRH nurses to admit patients for inpatient stays at LPRH under false diagnoses, Smith sometimes fabricated medical conditions the patients do not have.

95. Smith approved the admission of R.G. for inpatient stays at LPRH approximately four times between 2014 and 2015 for a cerebrovascular accident.

96. R.G. had debility, not a cerebrovascular accident, and did not require an inpatient stay at LPRH for physical rehabilitation.

97. Smith approved the admission of R.L. for inpatient stays at LPRH approximately nine times between 2014 and 2016 for quadriplegia.

98. R.L. had debility, not quadriplegia, and did not require an inpatient stay at LPRH for physical rehabilitation.

99. Morrill saw R.L. ambulating at LPRH.

100. Goodie saw R.L. ambulating at a different facility.

101. Smith approved the admission of S.S. for inpatient stays at LPRH approximately three times between 2013 and 2014 for a cerebrovascular accident.

102. S.S. had a urinary tract infection, not a cerebrovascular accident, and did not require an inpatient stay at LPRH for physical rehabilitation.

103. Smith approved the admission of J.M. for inpatient stays at LPRH approximately four times between 2014 and 2015 for post-prosthetic training.

104. J.M. had peripheral vascular disease and did not need post-prosthetic training requiring an inpatient stay at LPRH for physical rehabilitation.

105. Smith approved the admission of M.B. for inpatient stays at LPRH approximately two times between 2012 and 2013 for a cerebrovascular accident.

106. M.B. had sickle cell disease, not a cerebrovascular accident requiring an inpatient stay at LPRH for physical rehabilitation.

107. M.B. ambulated independently.

108. Smith approved the admission of N.L. for inpatient stays at LPRH approximately three times between 2014 and 2015 for a cerebrovascular accident.

109. N.L. had mental health problems, not a cerebrovascular accident requiring an inpatient stay at LPRH for physical rehabilitation.

110. N.L. sought prescription pain medications.

111. Smith approved the admission of W.F. for inpatient stays at LPRH approximately two times between 2014 and 2015 for a cerebrovascular accident.

112. W.F. had mental health problems, not a cerebrovascular accident requiring an inpatient stay at LPRH for physical rehabilitation.

**Examples of Patient Complications Smith Fabricated to Admit Patients**

113. When directing LPRH nurses to admit patients for inpatient stays at LPRH under false diagnoses, Smith sometimes fabricates complications commonly associated with real medical conditions the patients have.

114. Smith approved the admission of A.P. for inpatient stays at LPRH approximately six times between 2012 and 2013 for multiple sclerosis with exacerbation.

115. A.P. has multiple sclerosis, but Smith never ordered neurologic tests to confirm that A.P. had an exacerbation requiring an inpatient stay at LPRH for physical rehabilitation.

116. Smith approved the admission of A.C. for inpatient stays at LPRH approximately six times between 2014 and 2015 for post-prosthetic training.

117. A.C. had 24-hour care and did not require an inpatient stay at LPRH for physical rehabilitation.

118. Smith approved the admission of D.A. for inpatient stays at LPRH approximately three times between 2014 and 2015 for post-prosthetic training.

119. D.A. did not require an inpatient stay at LPRH for physical rehabilitation because D.A. was already able to perform activities of daily living and function on his own with his prosthetic prior to his admissions.

120. Even though post-prosthetic training generally only requires one inpatient stay, Smith approved the admission of R.D. for inpatient stays at LPRH approximately three times between 2014 and 2015 for post-prosthetic training.

121. R.D. did not need multiple inpatient stays at LPRH for post-prosthetic training.

122. Smith directed Goodie to admit patients under false diagnoses while she worked there from February 2005 to March 2015.

123. Goodie complied with Smith's instructions and entered false diagnoses for some patients.

124. Smith instructed Morrill by phone what the diagnosis was for each patient while she worked at LPRH from May 2012 to May 2015.

125. LPRH has received millions of dollars as a result of false claims submitted to Medicare because Smith has been directing LPRH's nurses to admit patients for inpatient stays at LPRH since 2005.

126. Altogether, approximately half of LPRH's inpatient population—90 percent of whom are Medicare patients—were admitted under false diagnoses.

**Other Misconduct by the Defendants**

127. Smith failed to meet face-to-face with patients at least three days each week during their inpatient stays.

128. Medicare requires a rehabilitation physician to meet face-to-face with patients at least three days each week during their inpatient stay.

129. Smith failed to certify IRF patient assessment instrument forms by signing them within 48 hours of patient admissions for inpatient stays.

130. Medicare requires a rehabilitation physician to certify IRF patient assessment instrument forms by signing them within 48 hours of patient admissions for inpatient stays.

131. In 2015, AMG fired LPRH's Chief Executive Officer Jonathan Landreth for ordering Goodie to change dates on the IRF patient assessment instrument forms for Medicare.

132. LPRH's Chief Executive Officer Jonathan Landreth ordered these date changes to cover up Smith's failure to countersign the paperwork within the required 48-hour period.

133. AMG allowed Smith to keep her job despite knowing that Smith failed to countersign IRF patient assessment instrument forms for Medicare within the required 48-hour period and that Smith had hundreds of outstanding patient discharges to complete for medical services that had already been billed to Medicare.

134. AMG required Goodie to sign a non-disclosure agreement with AMG about the circumstances surrounding the termination of LPRH's Chief Executive Officer Jonathan Landreth.

135. AMG would have fired Goodie had she refused to sign the non-disclosure agreement about the circumstances surrounding the termination of LPRH's Chief Executive Officer Jonathan Landreth.

136. Smith's misconduct continued after AMG fired LPRH's Chief Executive Officer Jonathan Landreth and after Goodie signed the non-disclosure agreement with AMG.

137. Tommy Strohe, LPRH's Interim Chief Executive Officer after AMG fired LPRH's Chief Executive Officer Jonathan Landreth, knew Smith operated her clinic at LPRH.

138. Tommy Strohe, LPRH's Interim Chief Executive Officer after AMG fired LPRH's Chief Executive Officer Jonathan Landreth, allowed Smith to operate her clinic at LPRH.

139. Goodie submitted her resignation in March 2015 because she could no longer endure Smith's practices.

140. LPRH asked Goodie to stay and offered her a raise, which Goodie turned down.

141. At the time of Goodie's resignation in March 2015, Smith had not certified dozens IRF patient assessment instrument forms for Medicare for medical services for which Medicare had already been billed.

142. Smith said to Morrill on multiple occasions words to the effect that Smith "could sell shoes to a man with no feet."

143. LPRH and AMG are aware of Smith's misconduct but have not taken any disciplinary action against her.

144. LPRH and AMG benefit from Smith's misconduct.

145. Patients admitted for inpatient stays at LPRH benefit LPRH and AMG financially.

146. Carol Washington, LPRH's Chief Executive Officer, resigned effective November 4, 2016.

147. Before her resignation, Carol Washington said words to the effect of, "If I stay I will lose my license."

148. Around the time of her resignation, Carol Washington said words to the effect of, "Someone will blow the whistle on this place."

149. Around the time of her resignation, Carol Washington said words to the effect of, "Medicare will close this place down."

## COUNT I
### Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

150. Relators reassert and incorporate by reference all paragraphs set forth above as if restated herein.

151. Defendants AMG, LPRH, and Smith are violating or have violated the federal False Claims Act by knowingly presenting false or fraudulent claims for approval and payment to Medicare.

152. As set forth more fully above, these Defendants, acting with knowledge:

   a. Submitted claims for payment to Medicare for medical services they knew were unnecessary and unreasonable because patients admitted for inpatient stays at

        LPRH under false diagnoses could not reasonably be expected to actively participate in and benefit from an intensive rehabilitation therapy program; and

    b. Submitted claims for payment to CMS for medical services that were unnecessary and unreasonable because they knew rehabilitation physicians failed to conduct face-to-face visits with each patient at least three days each week during the patient's stay in the IRF to monitor and modify their treatment as needed.

153. Defendants' false statements were material to CMS's decision to pay the Medicare claims.

154. The federal government has been damaged as a result of these Defendants' conduct by paying money for unnecessary and unreasonable medical services.

## COUNT II
### Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

155. Relators reassert and incorporate by reference all paragraphs set forth above as if restated herein.

156. Defendants AMG, LPRH, and Smith are violating or have violated the federal False Claims Act by knowingly making or using, or causing to be made or used, false records or statements that were material to false or fraudulent claims.

157. As set forth more fully above, these Defendants, acting with knowledge:

    a. Falsify or have falsified certification dates on IRF patient assessment instrument forms to conform with the requirement that those forms be certified within 48 hours of patient admissions for inpatient stays;

    b. Falsely certify or have falsely certified that IRF patient assessment instrument forms accurately reflect patient assessment as a basis for ensuring patients receive appropriate and quality care and as a basis for payment from federal funds; and

    c.   Submit or have submitted falsified IRF patient assessment instrument forms to CMS to support the false claims LPRH submits to CMS for Medicare payment.

158.   Defendants' false records were material to CMS's decision to pay the Medicare claims.

159.   The federal government has been damaged as a result of these Defendants' conduct by paying money for unnecessary and unreasonable medical services.

## JURY DEMAND

160.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Relators demand a jury trial as to all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** the Relators Goodie and Morrill, acting on behalf of and in the name of the United States of America, and on their own behalf, pray that, after due proceedings are had, judgment be entered against Defendants for violations of the federal False Claims Act as follows:

    a.   In favor of the United States against Defendants for treble damages to the federal government and the maximum civil penalties for each violation of the federal False Claims Act;

    b.   In favor of the Relators for the maximum amount pursuant to 31 U.S.C. §§ 3730(d), as well as reasonable expenses, attorney fees, costs, and interest incurred by the Relators and her counsel;

    c.   For all costs of the False Claims Act civil action; and

    d.   In favor of the Relators and the United States for further relief as this court deems just and equitable.

                              Respectfully submitted,

By:    /s/  John H. Musser, V
       John H. Musser, V (La. Bar #22545)
       Murphy, Rogers, Sloss, Gambel & Tompkins
       One Shell Square
       701 Poydras Street
       Suite 400
       New Orleans, LA 70139
       (504) 523-0400
       (504) 523-5574 (facsimile)
       jmusser@mrsnola.com

       - and -

       David L. Scher (VA. Bar #47634)
       *Pro Hac Vice* to be filed
       R. Scott Oswald (VA Bar #41770)
       *Pro Hac Vice* to be filed
       The Employment Law Group, P.C.
       888 17th Street, NW, Suite 900
       Washington, D.C. 20006
       (202) 261-2802
       (202) 261-2835 (facsimile)
       dscher@employmentlawgroup.com
       soswald@employmentlawgroup.com

       *Counsel for the Plaintiffs-Relators*

**PLEASE SERVE:**

Acadiana Management Group, LLC,
Through its agent for service of process,
August J. Rantz, IV
101 La Rue France, Suite 500
Lafayette, LA  70508

Lafayette Physical Rehabilitation Hospital, LLC
Through its agent for service of process,
August J. Rantz, IV
101 La Rue France, Suite 500
Lafayette, LA 70508

Carolyn Smith, personally
307 Polly Lane
Lafayette, LA  70508